IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| ) | |
| CLIFFORD EUGENE DAVIS, JR., *et al.* ) | |
| ) | |
| *Plaintiffs*, ) | CIVIL ACTION |
| ) | |
| v. ) | 56-1662-D-M3 |
| ) | |
| EAST BATON ROUGE PARISH ) | Judge James J. Brady |
| SCHOOL BOARD, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## JOINTLY PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiff class comprising all school aged black children and their parents/legal guardians within the jurisdiction of the East Baton Rouge Parish School System represented by the Baton Rouge Branch of the National Association for the Advancement of Colored People ("NAACP"), the United States of America (the "United States"), and the defendant, the East Baton Rouge Parish School Board (the "School Board" or "School System") jointly agree upon and propose the following findings of fact and conclusions of law to finally settle *Davis, et al. v. East Baton Rouge Parish School Bd.*, No. 56-1662-A (M.D. La.) (the "Lawsuit").

### FINDINGS OF FACT

1.     In making these findings of fact, the Court has considered the Final Settlement Agreement entered into by the parties, as well as the affidavits, briefs, reports, and studies the various parties, court-appointed monitors, and *amici* have from time to time submitted since the adoption of the 1996 Consent Decree.

| INITIALS | DOCKET# |
|---|---|
| nt | 1892 |

2.     The representative of the plaintiff class, the Baton Rouge Branch of the NAACP (the "Baton Rouge Branch"), is an organization that represents the interests of African American residents in the greater Baton Rouge area. The Baton Rouge Branch has members who have children in the East Baton Rouge Parish public schools.

3.     During the 2002-2003 school year, the School Board operated 93 regular education facilities, 61 elementary schools (K-5), 17 middle schools (6-8), and 15 high schools (9-12). All schools enroll the indicated grade levels except Northeast Elementary (K-6) and Northeast High School (7-12).[1]

4.     Since 1996, the School Board has been operating under the terms of a Consent Decree, entered into by all parties, and approved by the Court. The Consent Decree imposed a wide range of individual requirements on the School Board. These are grouped generally into obligations pertaining to (1) operating magnet, gifted, and talented programs, (2) improving the educational resources available at racially identifiable black schools; (3) improving the facilities available at racially identifiable black schools; (4) operating a Majority to Minority (M-to-M) program; (5) elimination of temporary buildings; and (6) achieving a substantially racially balanced faculty and staff.

5.     The Consent Decree required the School System to operate 33 magnet, gifted and talented programs. All but three of these were "programs-within-schools." These programs were intended to provide quality academic programs, while attracting non-black students into majority black schools. The School System substantially implemented each of these programs. Many of these programs were academically successful. The most successful were the three dedicated magnet programs. Very few of the programs-within-school were successful in

---

[1] For purposes of calculating racial identifiability, grades six, seven and eight are detached from these schools, and treated as a hypothetical middle school.

attracting non-black students. In 2001-02, the School System implemented the changes to the magnet program required in the report of the magnet improvement committee, as required by the Court. In operating the magnet program, the School Board has consulted and cooperated with the Court-appointed educational programs monitor. The School System has spent on the magnet program more than twice the level of funding projected by the Consent Decree.

6.     The School System has operated gifted and talented programs and has implemented the guidelines for these programs established by Bulletin 1508 as required in the Consent Decree. The School System implemented a "scholastic academy" program to identify and recruit non-traditional gifted and talented students.

7.     Each school year since the Consent Decree was entered, the School Board has made available $900,000 in an Individual Equity Account for racially identified black schools to be spent on teaching materials and other educational resources. The School System has also funded "Y-Factor" positions at racially identifiable black schools, to provide additional teachers and/or staff, as required by the Consent Decree. The School System has also dedicated substantial amounts to upgrade technology resources at these schools.

8.     Each year since 1997, the School System has made available in excess of $1 million for facilities remediation at racially identifiable black schools, and has spent these funds consistent with the recommendations of the Court-appointed facilities monitor. In addition, since 1997 the School System has spent substantial funds from its general budget on remedying facilities at racially identifiable black schools.

9.     The School System has eliminated T-buildings on the schedule required by the Consent Decree, as modified by subsequent court orders.

10. Since 1981, the School System has operated a Majority-to-Minority transfer system, under which any student in the majority race at a school may transfer to a school where the student would be in the minority of students.

11. During the 2002-2003 school year, the School Board assigned its faculty and staff such that the faculties at all schools had a racial balance that was within +/- 20 percentage points of the system wide average racial balance. Most schools had a faculty and staff that were within +/- 15 percentage points of the system-wide average racial balance.

12. During the 2002-2003 school year, the School System enrolled 49,683 regular education students, of whom 35,737 were black, and 13,946 were non-black.[2] At the elementary level, the School System enrolled 24,436 students, 5,974 non-black and 18,462 black. At the middle school level, the School System enrolled 11,167 students, 8,338 black, and 2,829 non-black. At the high school level, the School System enrolled 14,080 students, 5,143 non-black and 8,937 black.

13. Between 1975 and 2003, overall enrollment in the School System has fallen, and its racial makeup has changed from majority white to majority black. The following chart shows total enrollment, including all students, by race for select years.

|      | Total  | White Enrollment (%) | Black Enrollment (%) |
|------|--------|----------------------|----------------------|
| 1975 | 67,994 | 41,554 (61%)         | 26,440 (39%)         |
| 1980 | 64,079 | 37,220 (58%)         | 26,859 (42%)         |
| 1982 | 56,092 | 29,183 (52%)         | 26,909 (48%)         |
| 1988 | 58,324 | 26,646 (46%)         | 31,678 (54%)         |
| 1995 | 58,328 | 22,805 (39%)         | 35,523 (61%)         |
| 2001 | 51,292 | 14,975 (29%)         | 36,317 (71%)         |

---

[2] As has been customary throughout this litigation, the term "black" is used to refer to all African American and mixed-race African American students.

14.     Transportation to school is available to all students according to a uniform policy and without regard to race.

15.     Extra curricular activities are open to all students according to a uniform policy and without regard to race.

16.     Taking into account the relative age of facilities, and other non-race factors, the School Board's facilities are not racially identifiable.

17.     For purposes of this litigation, a school has been considered "racially identifiable" if its enrollment departs from the system-wide average for its level of education (*i.e.* elementary, middle, or high) by more than +/- 15 percentage points.

18.     During the 2002-2003 school year, an elementary school was considered racially identifiable white if it enrolled more than 39.3 percent non-black students, and racially identifiable black if it enrolled greater than 90.7 percent black students. An elementary school was considered neither racially identifiable black or white if it enrolled between 60.7 to 90.7 percent black students. During the 2002-2003 school year, the school system had 13 racially identifiable white elementary schools, and 27 racially identifiable black elementary schools.

19.     During the 2002-2003 school year, the 12 racially identifiable white elementary schools had non-black enrollments as follows: Bellingrath Hills, 53.5%; Cedarcrest, 46.6%; Jefferson Terrace, 42.5%; Northeast, 61.6%; Northwest, 63.2%; Parkview, 47.8%; Riveroaks, 48.7%; Shenandoah, 68.7%; Tanglewood, 55.4%; Wedgewood, 53.4%; Westminster, 40.3 %; Zachary, 58.7%.[3] The 27 racially identifiable black elementary schools, Banks, Beechwood, Claiborne, Crestworth, Dalton, Delmont, Dufrocq, Eden Park, Forest Heights, Glen Oaks Park, Greenville, Harding, Highland, Howell Park, Lanier, Magnolia Woods, Melrose, Merrydale,

---

[3] Baton Rouge Center for the Visual & Performing Arts had a non-black enrollment of 51.5% in accordance with the Consent Decree requirement that it seek to enroll a student body that is 50 percent black and 50 percent non-black.

Mohican, Nicholson, North Highlands, Park, Polk, Progress, Ryan, Westdale, and Winbourne elementary schools, each enrolled more than 91 percent black students.

20.     During the 2002-2003 school year, a middle school was racially identifiable black if it had a black enrollment greater than 88.8 percent, and was racially identifiable white if it had a non-black enrollment greater than 41.2 percent. During the 2002-2003 school year, the School System had seven racially identifiable black middle schools, and five racially identifiable white middle schools.

21.     The five racially identifiable white middle schools had non-black enrollments as follows: Central, 50.1%; Glasgow, 46.9%, Northeast (6-8), 57.6%, Northwestern, 53.5%, Southeast, 49.6%. The seven racially identifiable black middle schools, Capitol, Crestworth, Glen Oaks, Istrouma, McKinley, Prescott, and Scotlandville middle schools, each had a black enrollment in excess of 91 percent black.

22.     During the 2002-2003 school year, a high school was racially identifiable black if it had a black enrollment greater than 78.7 percent, and was racially identifiable white if it had a non-black enrollment greater than 51.3 percent. During the 2002-2003 school year, the School System had six racially identifiable black high schools, and five racially identifiable white high schools.

23.     The four racially identifiable white high schools had non-black enrollments as follows: Central, 78.7%, Northeast, 53.6%, Woodlawn, 54.2%, Zachary, 65.5%.[4] The six racially identifiable black high schools, Baker, Belaire, Capitol, Glen Oaks, Istrouma, and Scotlandville high schools, each had an enrollment in excess of 97 percent black.

---

[4] Baton Rouge Magnet High School had a non-black enrollment of 52.8% in accordance with the Consent Decree requirement that it seek to enroll a student body that is 50 percent black and 50 percent non-black.

24. The School Board filed a motion for unitary status in February 2002. In June 2002, the Court entered an order holding that the School Board could not move for complete unitary status until 2005 under the terms of the Consent Decree, but the Court would *sua sponte* consider whether the School Board had achieved partial unitary status with respect to various *Green* factors. The School Board filed a Motion to Alter or Amend the Judgment pursuant to FED. R. CIV. P. 59, but the Court stayed consideration of the motion pending the outcome of court-ordered mediation. For the past year, the parties have engaged in intensive mediation with the assistance of the co-mediators, United States District Judge Tucker Melançon and Bernard E. Boudreaux, Esq. In June 2003, the lawyers for each of the parties reached an agreement setting forth terms on which they would recommend that their clients settle the case. Thereafter, the School Board and the Baton Rouge Branch of the NAACP both voted to approve the settlement, and on July 16, 2003, the Final Settlement Agreement was entered by the Baton Rouge Branch of the NAACP on behalf of the plaintiff class, the United States Department of Justice, and the School Board.

25. In the Final Settlement Agreement, the parties agreed that the Court may make a finding of full unitary status based on prior actions and enforceable commitments in the Agreement, vacate all prior orders and injunctive relief in the case, and enter a Final Judgment and Order dismissing the lawsuit with prejudice, subject only to its continuing jurisdiction to enforce the terms of the Agreement during its term, should that be necessary. In exchange, the School Board agreed to undertake a number of obligations over the four-year term of the Agreement, including the following:

- Continue to operate the existing dedicated magnet programs
- Open two new dedicated academic magnet middle schools

- Open two new dedicated academic magnet elementary schools

- Target enrollment at the dedicated magnet schools at 55 percent black, 45 percent non-black

- Launch three new Centers of Excellence (programs in Construction Trades, Business and Government Affairs, and Emerging Technologies) and coordinate them with existing programs at Crestworth Middle School, and Glen Oaks, Istrouma, and Scotlandville High Schools

- Implement the magnet program on the following schedule: comprehensive planning in 2003-04, open new elementary magnets in 2004-05, and new middle school magnets in 2005-06

- Continue the M-to-M program with a modification that will permit black students to transfer from schools that are more than 55 percent black to schools that are less than 55 percent black

- Provide at least 108 additional "highly qualified" teachers to the racially identifiable black elementary schools

- Continue to offer the Extended Day, Extended Year, and Pre-K programs during the four year term so long as federal and state funding remains available

26.    On July 17, 2003, the Court entered an order preliminarily approving the Final Settlement Agreement, certifying the plaintiff class, designating the Baton Rouge Branch as Class Representative, ordering the School Board to provide notice of the settlement to the class and to the public, and scheduling a fairness hearing.

27.    The School Board has provided notice of the settlement as required by the July 17 order. Specifically, the School Board published the notice on its web site, the notice was published on the Court's web site, and the notice appeared in the *Advocate* on July 26, July 30, and August 2, 2003, in the Baton Rouge Weekly Press on July 24 and July 31, 2003. In addition, the settlement received substantial publicity in the Baton Rouge media. Specifically, both the *Advocate* and the news programs broadcast on television by WAFB and WBRZ ran several

stories describing the substance of the Final Settlement Agreement after it was submitted to the Court on July 17, 2003.

28.     The Court's July 17 order required that any comments or objections to the Final Settlement Agreement must be submitted on or before August 7, 2003.  On that date, the Court received four submissions.

a.     The Citizens Task Force for Education Improvement, a volunteer group previously recognized by the Court as consisting of "individuals who represent the best interests of this or any community by having among its members, representatives of races, genders and religions and specifically the parents of school children, retired teachers and administrators, plant-works, religious leaders, community volunteers, doctors, lawyers, bankers, and leaders of business and industry," Order dated Aug. 31, 2000 at 1, submitted a Memorandum urging the Court to approve the Final Settlement Agreement.  The Citizens Task Force concluded that "with the implementation of all of the components of the settlement agreement, it is the view of the Task Force that the EBRPSS will be a world-class school system that will provide a high quality education for all of its students."  Memorandum in Support of Settlement Agreement at 3.

b.     Ms. Mattie Coxe, who identified herself as a Native American parent of a four-year old (and thus is not a member of the plaintiff class), submitted a letter urging the Court to "proceed with declaring the East Baton Rouge Parish Schools unitary because alterations in society and the school system has substantially achieved the original intent of school desegregation suits; that is, guaranteeing the equal right of Black people to participate in civil society including Black children not being excluded from public schools."  Coxe Letter at 1. However, Ms. Coxe urged the Court to alter the terms of the Final Settlement Agreement,

primarily to address (i) her concern that the southwestern part of the Parish near her home has no regular public schools; and (ii) her belief that the Final Settlement Agreement's magnet school provisions require the School System to offer an inferior education to children attending the community schools and harm neighborhood schools.

      c.    Ms. Fannie G. Godwin, a school boardwatcher who does not currently have school age children (and thus is not a member of the plaintiff class), also submitted a letter concluding that "this case needs to come to an end ...." Godwin Letter at 1. However, Ms. Godwin also urged the Court to alter the Final Settlement Agreement to (i) require the School Board, for each of the next 10 years, to give each elementary school with a black enrollment over 75 percent $1,000 for each year that this case has remained pending; and (ii) require the School Board to implement all improvements that have been recommended by the Court Monitor.

      d.    Five members of the Education Committee of the NAACP submitted an opposition to the Final Settlement Agreement. None of the five have school-age children, and thus none are members of the plaintiff class. These objectors made two procedural objections and four substantive objections to the Final Settlement Agreement. First, they argued that the Notice required by the Court's July 17, 2003, Order was inadequate because it was not mailed to each individual class member. Second, they argued that class members should have been given the right to opt out of the class. Substantively, the Education Committee objectors argued that the release set forth in the Final Settlement Agreement prohibits members of the class from bringing future discrimination suits. Second, they objected to the provision in the Final Settlement Agreement requiring the School System to provide 108 additional "highly qualified" teachers to the racially identifiable black elementary schools, arguing that the State's definition

of "highly qualified" is inadequate. Third, they argued that the Final Settlement Agreement requires students at Glen Oaks, Istrouma, and Scotlandville High Schools to complete Honors courses as a prerequisite to Advanced Placement courses. Finally, they argued that the School System should be required to fund a Parent Involvement Program that would involve their committee.

## CONCLUSIONS OF LAW

1.      This lawsuit was filed in 1956 as a class action. Complaint ¶ 4. On July 17, 2003, a class comprising all school-aged black children within the jurisdiction of the East Baton Rouge Parish School System and their parents or legal guardians was properly certified under *Graves v. Walton County Board of Education*, 686 F.2d 1135 (5th Cir. 1982), and *Jones v. Caddo Parish School Board*, 735 F.2d 923 (5th Cir. 1984). *See* Order (July 17, 2003).

2.      The Class is represented by the NAACP, a proper class representative with standing. *See Turner v. Orr*, 722 F.2d 661, 662 (11th Cir. 1984) (Local NAACP branch serving as class representative in a Title VII discrimination suit). The Class includes and represents all parties with standing to maintain the present lawsuit. *See Pasadena City Bd. of Educ v. Spangler*, 427 U.S. 424, 430 (1976); *DeFunis v. Odegaard*, 416 U.S. 312, 317-18 (1974); *Pederson v. LSU*, 213 F.3d 858, 874 (5th Cir. 2001).

3.      Federal Rule of Civil Procedure 23(e) requires that any settlement of a class action must be approved by the Court following notice to the class in the manner directed by the Court. The type of notice required varies with the type of class certified. The class in this instance was certified under Federal Rule of Civil Procedure 23(b)(2). Contrary to the objection submitted by the five members of the Education Committee, members of such a class do not have a right to individual notice. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412-13 (5th

Cir. 1998); *Meza v. General Battery Corp.*, 908 F.2d 1262, 1269 n.7 (5th Cir. 1990). It is settled that notice may be provided by publication and need not be mailed to each individual class member, particularly where, as here, the large number of class members makes individually mailed notice impractical. *See, e.g., Mendoza v. United States*, 623 F.2d 1338, 1351 (9th Cir. 1980); *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021 (N.D. Ca. 1999).[5] The Education Committee objectors cite the requirement that "individual notice to all members who can be identified through reasonable effort" set forth in Rule 23(c)(2), but that requirement only applies to class actions certified under Rule 23(b)(3); school desegregation cases are brought pursuant to Rule 23(b)(2), as the defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(e) requires only that notice of a settlement be provided "in such manner as the Court directs," and leaves the form to the Court's broad discretion. *Jones v. Caddo Parish*, 704 F.2d 206, 217 n.20 (5th Cir. 1983); *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979). As noted above, notice by publication is sufficient. Likewise, their argument that the Court should have provided class members the right to opt out is erroneous as a matter of law because that right is available only to members of a class certified pursuant to Rule 23(b)(3). *Allison*, 151 F.3d 402, 412-13 (5th Cir. 1998).

4. "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate, and reasonable" to the class. *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 207 (5th Cir. 1981) (citations and

---

[5] The claim that the School System has the ability to easily mail notice to all class members using its enrollment records is inaccurate because the class is not limited to black children enrolled in the East Baton Rouge Parish School System. Black children attending private school or receiving home schooling are also members of the class.

internal quotations omitted). In evaluating the fairness of the settlement, the court must consider the range of likely outcomes for the plaintiff class if the matter went to trial. *Id.* at 212.

5.      If the School Board's motion for unitary status went to trial, the School Board would bear the obligation of demonstrating that it had complied in good faith with the Court's desegregation orders and that it had eliminated, to the extent practicable, the vestiges of *de jure* segregation in student assignment, faculty and staff assignment, transportation, facilities, and extra-curricular activities. *See Missouri v. Jenkins*, 515 U.S. 70, 89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 492 (1992); *Board of Educ. v. Dowell*, 498 U.S 237, 249-50 (1991). Accordingly, it is appropriate to consider whether the School System could satisfy this standard.

6.      For the most part, the School Board has substantially complied with the desegregation decree in this case. In instances where the School Board has contested a requirement imposed by the Court's Orders, the School Board did so in good faith.

7.      The School Board has eliminated the vestiges of *de jure* segregation to the extent practicable with respect to faculty and staff assignment by assigning faculty and staff members in a manner that ensured that the faculties and staffs of schools system-wide reflected the system-wide racial makeup of the faculty and staff. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969), *vacated in part sub nom. Carter v. West Feliciana Parish Sch. Bd.*, 396 U.S. 226 (1969), and *rev'd in part*, 396 U.S. 290 (1970). The School System has met its obligations with regard to faculty and staff.

8.      The School Board has eliminated the vestiges of *de jure* segregation to the extent practicable with respect to transportation by providing transportation without regard to race. *See Flax v. Potts*, 915 F.2d 155, 156 (5th Cir. 1990); *United States v. Texas Educ. Agency*, 647 F.2d

504, 507 (5th Cir. 1981); *NAACP v. Duval County Sch.*, 273 F.3d 960, 967 (11th Cir. 2001). The School Board has met its obligations with regard to transportation.

9.      The School Board has eliminated the vestiges of *de jure* segregation to the extent practicable with respect to extracurricular activities by ensuring that they are open to all students without regard to race. *See Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 757 (5th Cir. 1989); *Duval County*, 273 F.3d at 967. The School Board has met its obligations with regard to extra-curricular activities.

10.      The School Board has eliminated the vestiges of *de jure* segregation to the extent practicable with respect to facilities by ensuring the System's facilities are not amenable to racial identification simply on the basis of their physical condition. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18 (1971). To the extent that individual racially identifiable facilities differ significantly from individual racially identifiable facilities enrolling a different race, the difference should be accountable for by non-race factors. *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 328 (4th Cir. 2001). Taking into account all relevant non-race considerations, including relative age, location, educational and non-educational usage, facility design, structure, and construction, the School System has met its obligations with regard to facilities.

11.      With respect to student assignment, the existence of racially identifiable schools does not preclude a finding that the School Board has satisfied its obligation to eliminate the vestiges of *de jure* segregation to the extent practicable. *See Freeman,* 503 U.S. at 494; *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991); *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 222, 228 (5th Cir. 1983). Rather, the Court must determine first whether a racially identifiable school is in fact a vestige of discrimination, and if so, whether it is susceptible to

further practicable desegregation efforts. *Freeman*, 503 U.S. at 498; *Dowell*, 498 U.S at 249. If the racial imbalance was caused by something other than the prior regime of *de jure* segregation, it will not be deemed a vestige. "The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have causal link to the *de jure* violation being remedied." *Freeman*, 503 U.S. at 496.

12.     In the nomenclature of this case, 21 of the System's schools were labeled "racially identifiable white" in 2002-03.[6] They received this label because their black student bodies were more than 15 percentage points below the System-wide percentage. Of the 21 schools so labeled, the school with the highest non-black enrollment is Central High School, with 78.7 percent non-black students; the next most non-black is Shenandoah Elementary with 68.7 percent non-black students; followed by Zachary High School with 65.5 percent non-black students. Every other "white" school enrolls more than 40 percent black students, and in fact seven of the "racially identifiable white" schools enrolled more than 50 percent *black* students. Such schools cannot fairly be considered as "vestiges" of discrimination. In 1981, the Court made a specific finding that due to their geographic isolation, Bellingrath Hills, Parkview, Shenandoah, and Wedgewood were not susceptible of further practicable desegregation. *Davis v. East Baton Rouge Parish Sch. Bd.*, 514 F. Supp. 514 F. Supp. 869, 874 (M.D. La. 1981).

13.     Unlike the "racially identifiable white" schools, the "racially identifiable black" schools do have essentially all-black enrollments. The school system's enrollment today is very different from its enrollment when this lawsuit was filed in 1956, when the system was overwhelmingly non-black, and even from its racial makeup in 1975, when it was still predominantly non-black. Particularly since 1980, non-black enrollment has steadily decreased,

---

[6] Although referred to as "white," the "white" enrollment at these schools actually included all non-black students.

and black enrollment has steadily increased. Absent compelling evidence to the contrary, changes in overall enrollment in the system must be considered the result of private choices. *See Davis v, East Baton Rouge Parish School Board*, 498 F. Supp. 580, 585 (M.D. La. 1980). Racial imbalance arising from such choices is not, as a matter of law, a vestige of discrimination that a School Board must eliminate. *Flax*, 915 F.2d at 161-62 ("Because those changes occurred during the life of the desegregation plan, they are reactions to that plan — to the extent that they are not reactions to other social and economic factors. The [System] is not now required to take further steps to counter the effects of what may amount to a 'white slight' to its plan.") (internal citation omitted).

14. General demographic changes in enrollment have clearly impacted specific schools in a manner that makes clear that current racial imbalance is not a product of prior discrimination. Schools that were previously *de jure* segregated white, which now enroll a predominantly black student body cannot constitute a vestige of prior *de jure* segregation. *Freeman*, 503 U.S. at 478, 495. Additionally, schools previously brought into racial balance by remedial efforts, but which have since fallen out of balance as a result of private choices such as changes in demographics, similarly cannot constitute a vestige of prior *de jure* segregation. *Id.*; *Duval County*, 273 F.3d at 969-73; *Belk*, 269 F.3d at 395-96. Also, a school opened under the Court's supervision, and with the Court's approval, equally cannot constitute a vestige of prior de jure segregation. Finally, the passage of time renders it increasingly unlikely that current racial imbalance was caused by prior *de jure* segregation. *Freeman*, 503 U.S. at 491-92; *Hull v. Quitman County Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993).

15.     Of the School System's 40 racially identifiable black schools, for the foregoing reasons 26 cannot possibly constitute vestiges of prior *de jure* segregation.  Beechwood, Claiborne, Delmont, Forest Heights, Glen Oaks Park, Greenville, Highland, Howell Park, Lanier, Magnolia Woods, Melrose, Mohican, Merrydale, North Highlands, Ryan, Westdale, and Winbourne elementary schools, Glen Oaks, Crestworth, Istrouma, Prescott, and Scotlandville middle schools, and Baker, Belaire, Glen Oaks, Istrouma, and Scotlandville high schools, were all either previously "racially identifiable white" schools which have over time become racially identifiable black, or were brought into balance by the Court's remedial efforts, and have since fallen out of compliance.

16.     In 1981, the Court made a specific finding that a number of these schools cannot be practicably desegregated due either to their racial or geographic isolation.  Specifically, Banks, Crestworth, Dalton, Park, and Polk elementary schools, and Capitol high school, were all excluded from the 1981 desegregation plan as not susceptible of further desegregation. *Davis*, 514 F. Supp. at 874.

17.     As to the balance of the racially identifiable schools, it is extremely unlikely that any further desegregation is practicable.  Prior to 1996, the majority of these schools were subject to extensive busing to ensure racial balance.  Moreover, the School System has operated an M-to-M program for nearly two decades, under which any black student wishing to do so could elect to transfer to any school that enrolls a majority non-black student body.  The system has also operated a number of magnet programs.  Experience has demonstrated that the mandatory dislocation of significant numbers of students between schools leads to significant numbers of students, both black and white, leaving the school system.  The School Board is not legally accountable for such private choices.  The School Board implemented these remedial

programs at a time when many more non-black students were available to alter the racial balance at racially identifiable black schools. As the School System is now nearly 75 percent black, that is no longer the case. Accordingly, additional efforts beyond the already-attempted remedial programs are unlikely to achieve greater levels of integration, and are therefore impracticable. Therefore, the school system has met its obligations with regard to student assignment.

18.     In view of the foregoing, and considering the obligations the School System has agreed to shoulder as set out in the parties' Final Settlement Agreement, the East Baton Rouge Parish School Board is today a unitary school system. Accordingly, the settlement achieved by the Baton Rouge Branch of the NAACP, and agreed to by the Department of Justice, is very favorable to the class in that it continues a number of desegregation remedies for the four year term of the Final Settlement Agreement. Thus, the settlement is fair, adequate, and reasonable to the plaintiff class.

19.     This conclusion is not in anyway altered by the objections that have been submitted to the Court. First, none of the objectors are members of the plaintiff class, and thus they lack standing to object. *Paterson v. Texas*, 308 F.3d 448, 450-51 (5th Cir. 2002); *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 172 (5th Cir. 1979). For that reason alone, the Court may disregard their objections. Second, both Ms. Coxe and Ms. Godwin agree that the School System should be declared unitary and the case dismissed. Under settled Supreme Court precedent, once a school district is declared unitary, all authority to make policy reverts back to the elected school board. *See, e.g., Freeman*, 503 U.S. at 489-90. The Court lacks the authority to order the School System to, for example, build a new school near Ms. Coxe's home or to implement the facilities recommendations of the Court Monitor as Ms. Godwin requests. Indeed, it is settled that the Court's authority to review class action settlements under Rule 23(e) is

limited to accepting or rejecting the agreement reached by the parties; the Court may not alter their agreement. *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986) ("[T]he power to approve or reject a settlement negotiated by the parties ... does not authorize the court to require the parties to accept a settlement to which they have not agreed." ); *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1997) ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness"); *Macktal v. Secretary of Labor*, 923 F.2d 1150, 1155 (5th Cir. 1991) (discussing *Evans* standard in a different context); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 529 (N.D. Miss. 2003) ("The Court must consider the settlement as a whole; the court has no authority to modify the individual provisions of the settlement.").

20.     The substantive objections made by the dissenting members of the NAACP's Education Committee also do not alter the Court's conclusion that the settlement is fair, adequate, and reasonable to the plaintiff class.  As noted above, no objector has come forward from a class of over 35,000 black school age children and their parents.

21.     None of the reasons given by the dissenting Education Committee members is sufficient to cause the Court to override the Final Settlement Agreement.  First, their contention that the release perpetually bars class members from bringing future discrimination suits is simply wrong as a matter of law.  The release merely bars any claims that class members "has or have had or at any time in the future may have, *arising from or in any way related to the facts and events giving rise to the Lawsuit, that were or could have been asserted in the Lawsuit ....*" (emphasis added).  This standard release language merely bars claims arising primarily from past events that were or could have been asserted in this case.  This is no way precludes a suit based on any future acts of discrimination by the School System.  Second, the objectors' disagreement

with Louisiana's definition of what constitutes a "highly qualified" teacher is beyond the scope of this Lawsuit. Their complaint that most Teach for America and Teach Baton Rouge teachers have been assigned to racially identifiable black schools ignores the fact that those programs are designed to serve low income students. Third, the Education Committee objectors' complaint that the Final Settlement Agreement requires students at Glen Oaks, Istrouma, and Scotlandville High Schools to complete Honors courses as a prerequisite to Advanced Placement courses misreads the provision in question. It merely requires the School System to implement the Honors program first because it will provide students with the necessary background for Advanced Placement courses; the Agreement does not require Honors courses as pre-requisite to enrollment in an Advanced Placement course. The provision limiting the School System's obligation to provide Advanced Placement courses when less than 12 students apply is consistent with the System's general policy; principals have discretion to grant exceptions to this rule of thumb, but will generally do so only when there is a qualified teacher available. Finally, the objectors have not provided any legal basis for their request that the Court order the School System to fund a Parent Involvement Program.

22. Having found the Final Settlement Agreement to be fair, adequate, and reasonable to the plaintiff class, the Court hereby approves it. In accordance with the terms of the Final Settlement Agreement, the Court finds and concludes as follows:

a. the East Baton Rouge Parish School System has achieved full and complete unitary status on the basis of its prior actions and the enforceable commitments it has undertaken in the Final Settlement Agreement;

b.      the 1996 Consent Decree and all other orders and relief entered in this Lawsuit

should be dissolved and vacated; and

c.      this Lawsuit should be dismissed with prejudice.

d.      Final Judgment shall be entered reflecting these conclusions.

August 14, 2003                                     Respectfully submitted,


_Michael W. Kirk_

Michael W. Kirk (D.C. Bar #424648)
Gordon D. Todd (D.C. Bar #475203)
COOPER & KIRK, PLLC
1500 K St., N.W., Suite 200
Washington, D.C. 20005
(202) 220-9600


G. William Jarman (#7238)
Jennifer Jones Thomas (#26532)

KEAN, MILLER, HAWTHORNE, D'ARMOND,
   McCOWAN & JARMAN, L.L.P.
Post Office Box 3513
Baton Rouge, LA 70821
(225) 387-0999


Domoine D. Rutledge
General Counsel

East Baton Rouge Parish School Board
1050 South Foster Drive
Baton Rouge, LA 70806
(225) 922-5618

Attorneys for the East Baton Rouge Parish


J. Michael Wiggins
Acting Assistant Attorney General


Bradley J. Schlozman
Deputy Assistant Attorney General
Franz Marshall
Javier Guzman
U.S. Department of Justice
Civil Rights Division
Post Office Box 65958
Washington, DC 20035-5958


David Dugas
John J. Gaupp

United States Attorney's Office
777 Florida Street, Room 208
Baton Rouge, LA 70801
(225) 389-0443

Attorneys for the United States of America

School Board

_John Pierre_

John Pierre
2900 Westfork Drive, Suite 200
Baton Rouge, LA  70827
(225) 295-5638

_Arthur L. Thomas_

Arthur Thomas
1623 Main Street
Baton Rouge, LA  70802
(225) 344-7370

Attorneys for the Plaintiff Class and the Class Representative